UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOYCE A. BENTON

       Plaintiff,                             Case No. 06-12375

vs.                                       DISTRICT JUDGE VICTORIA A. ROBERTS
                                                  MAGISTRATE JUDGE STEVEN D. PEPE

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

       Defendant.
_____/

### REPORT AND RECOMMENDATION

Joyce A. Benton brought this action under 42 U.S.C. §405(g) to challenge a final decision of the Commissioner denying her application for Disability Insurance Benefits (DIB) under Title II and Supplemental Security Income under Title XVI of the Social Security Act. Both parties have filed motions for summary judgment which have been referred for report and recommendation pursuant to 28 U.S.C. §636(b)(1)(B) and (C). For the following reasons, IT IS RECOMMENDED that Defendant's motion for summary judgment BE DENIED and Plaintiff's motion for summary judgment be GRANTED and the matter remanded to the Commissioner for. Further administrative proceedings consistent with this Report and Recommendation.

**I.    BACKGROUND**

    **A.    Procedural History**

Plaintiff was born December 4, 1957, and was 48 at the time of the decision under review

(R. 46). Her past work was as a health care aide. Plaintiff filed an application for DIB and SSI on March 4, 2003, alleging disability beginning March 1, 2002, due to arthritis in her knees and depression (R. 46-48, 64, 192-93). Following a September 21, 2005, hearing before Administrative Law Judge Richard L. Sasena (ALJ), on December 22, 2005, Plaintiff's application was denied (R. 17-21). The Appeals Council denied Plaintiff's request for review (R. 4-6).

## B. Background Facts

### 1. Plaintiff's Hearing Testimony

Plaintiff testified that she last worked in January 2005 (R. 209), and was unable to work because of constant pain in her legs and ankles, which prevented her from standing except for short periods of time (R. 207, 212). If she stayed off her feet, the pain was "not as bad" (R. 212).

She had experienced problems with her knees since the 1980's, (R. 207) and they hurt if she sat or stood for too long (R. 214). Plaintiff was "stiff" when she woke up in the morning but that she was "fine" after she had moved about the house; later in the day, she experienced pain, the intensity of which depended upon how much time she spent on her legs (R. 214-15). Asked whether depression affected her ability to work, she said that she did not know (R. 208). Plaintiff also had high blood pressure but she could not tell when it was high (R. 221). She experienced chest pain, which had become less frequent with the use of medication and occurred mostly when she over-worked (R. 222). She had gained about 50 pounds in the past twelve months, but she did not believe that her weight gain had exacerbated her lower extremity pain, though it may have made it more difficult for her to walk long distances (R. 225-26).

Plaintiff was able to drive, take care of her personal needs (including grooming, dressing,

and bathing), complete housework, care for her child, practice her hobbies (canning, cooking, gardening, reading books) and attended church (where she was able to alternate between sitting and standing) every Sunday from 10:00 until 1:30 (R. 213, 217, 229).

Plaintiff testified that on the day before the hearing, she woke up and dressed, took her son to school on a bus, attended to some business and then returned home, where she picked and cleaned vegetables and placed them in freezer bags (R. 217-18). She then picked up her son from school, prepared food for him and then resumed putting the vegetables into freezer bags, cleaned up the kitchen, and then went to bed (R. 218). She said that this was a typical "good" day, although she added that, on some days, she returned to bed after taking her son to school.

Plaintiff did not know how much weight she could lift, but she said that she had no problem lifting a gallon of milk (R. 219). She could walk about a quarter mile, but experienced pain when she did so. She sometimes laid down during the day but tried not to do so. She last drank alcohol a few months prior to the hearing and had not used other drugs for over one year.[1] She had noticed a decrease in her depression since she had stopped using cocaine regularly (R. 221).

### 2. **Medical Evidence**

Because the ALJ's summary of the medical records (R. 17-18) is sufficiently thorough and accurate for purposes of this review, a further summary is not repeated in this Report.

### 3. **Vocational Expert Testimony**

ALJ Sasena asked the vocational expert to consider a hypothetical individual of Plaintiff's

---

[1] Asked to explain a positive test for cocaine usage, Plaintiff said that the test had been affected by her smoking a cigarette that was being passed around the room and that, unbeknownst to her, contained the drug (R. 220-21).

age and education, who was limited to performing sedentary work that allowed for an option to alternate between sitting and standing and that required no more than occasional climbing of stairs, stooping, kneeling, crouching, and crawling; no climbing of ropes, ladders, or scaffolds; and involved performing no more than simple, routine, repetitive tasks (R. 234-37).[2]

VE Roxane Minkus testified that such an individual could perform work as a bench assembler (with approximately 1,000 positions existing in the regional economy), parking lot attendant (1,200 positions), surveillance system monitor (1,500 positions), and cashier (1,500 positions) (R. 238).

### 4. ALJ Sasena's Decision

ALJ Sasena found that Plaintiff met the disability insured status requirements of the Act through March 31, 2004 (R. 20). The ALJ found that Plaintiff had not engaged in substantial gainful activity since the onset date of her alleged disability and that her arthritis, major depression, generalized anxiety disorder, polysubstance dependance and obesity were severe impairments, as defined in the Regulations, but that her impairments were not among those included in the Listing of Impairments at 20 C.F.R. pt. 404, subpt. P, app. 1, and did not, singly or in combination, meet or medically equal any of those listed. Among his findings was that Plaintiff had moderate limitations in the "concentration, persistence or pace." (R. 19).

ALJ Sasena found that Plaintiff's allegations regarding her limitations were not totally consistent with the record evidence and that she had the residual functional capacity (RFC) to

---

[2] ALJ Sasena also asked questions at the light exertional level not relevant to this review because ALJ Sasena found Plaintiff was limited to a significant range of sedentary work.

perform simple, routine, repetitive, sedentary work that allowed her to alternate at will between sitting and standing; never required climbing of ladders, ropes, or scaffolds; only occasionally required climbing of stairs, stooping, kneeling, crouching, and crawling; and required no more than frequent balancing.

Plaintiff could not perform any of her past work, but could perform a significant number of sedentary jobs in the economy and was therefore not disabled under the Act (R. 23).

## II. ANALYSIS

Plaintiff argues that ALJ Sasena failed to (a.) properly include her mental limitations in her RFC, (b.) weigh the opinion of her treating source and (c.) consider the effect obesity has on the severity of her impairments and ability to function.

### A. **Incorporating Mental Impairment in RFC**

When as in this case an ALJ makes a finding that a claimant has moderate restrictions in the category of "concentration, persistence or pace", but does not specifically include that limitation in the hypothetical question, "the question is whether the ALJ used adequate alternate concrete job restrictions in the hypothetical question that suitably accommodated the worker's concentration limitations." *See Edwards v. Barnhart*, 383 F.Supp.2d 920, 930 (E.D. Mich., 2005).

Plaintiff asks that the Court rely on *Bankson v. Commissioner*, 127 F. Supp. 2d 820 (E.D. Mich. 2000), wherein the Court noted that it was reasonable to conclude under the regulations "that a mental deficiency occurring 'often' may not be consistent with substantial gainful employment." *Id.* at 826. The *Bankston* Court then determined that under the relevant portion of the Psychiatric Review Technique Form (PRTF), "often" should logically be defined as fifty percent of the time.

5

*Id.* at 827. In *Bankston*, the finding that the claimant often had deficiencies of concentration, paired with the uncontested findings of the treating physician that he was disabled, resulted in a finding of disability and a remand for award of benefits. Yet, in *Bankston*, unlike the present case, the ALJ adopted the "often" finding in his PRTF. Here, ALJ Sasena did not complete a PRTF, but used the Commissioner's new regulations finding Plaintiff to be limited in the "concentration, persistence or pace" category at a moderate rate–the midpoint of the five possible selections of none, mild, moderate, marked or extreme (R. 19).

Although the *Bankston* decision cited by Plaintiff has been questioned,[3] and is no directly longer applicable given a change in the language of the regulations that were applied in the present case, it does correctly note that a hypothetical question must consider the severity, including the degree and/or frequency, of the claimant's concentration problems. Yet, Plaintiff's argument that ALJ Sasena was required to apply the formulaic fifty percent reduction in concentration to Plaintiff based solely on his finding of a moderate limitation in concentration, persistence or pace overlooks the regulatory changes[4] and more recent case law.

---

[3] The correctness of the *Bankston* decision under the previous regulation has been questioned as contrary to the Commissioner's Psychiatric Review Technique form instructions and the principle of deference to an administrative agency's construction of its own regulations so frequently noted since *Udall v. Tallman*, 380 U.S. 1, 16-17 (1965). See Report and Recommendation accepted by Chief Judge Rice in *Ogden v. Apfel*, Case No. c-3-00448 (S.D. Ohio June 11, 2001) (suggesting that *Bankston* is simply wrong because it ignores the Commissioner's interpretation of "often" in the regulations).

[4] This regulation and the corresponding form have now been changed so that limitations in concentration are no longer measured in terms of frequency, but rather on a five-point scale: none, mild, moderate, marked, and extreme. *See* 20 C.F.R. §404.1520a(c)(4) (Sept. 20, 2000); Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury; Final Rules, 65 Fed. Reg. 50,745, 50, 775 (Aug. 21, 2000); Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury; Correction, 65 Fed. Reg. 60584 (Oct. 12, 2000).

In *Smith v. Halter*, 307 F.3d 377 (6th Cir. 2001), the Court held that there is no mandate for the inclusion in the hypothetical of any specific limitation whenever an ALJ makes a finding in a PRTF that a claimant "often" experiences deficiencies in concentration, persistence, or pace. Rather, an ALJ's hypothetical questioning must "accurately set [ ] forth the plaintiff's physical and mental impairments." *Smith*, 307 F.3d at 378 (citing *Varley v. Secretary of HHS*, 820 F.2d 777, 779 (6th Cir.1987)).

The administrative record lacks objective medical findings or treatment records that would support a finding of a major impairment in this area. In fact, Plaintiff did not testify regarding any limitations in this area and her September 19, 2005, GAF was 55 (which comports with ALJ Sasena's finding of moderate limitation)[5]. Further, Plaintiff has not actually articulated a theory nor pointed to any evidence to support greater restrictions than those prescribed by ALJ Sasena, other than to point to *Bankston* and argue that this holding mandated that a fifty percent reduction in concentration be attributed to her upon ALJ Sasena's finding of moderate limitation in this area. Yet, ALJ Sasena did make a finding that Plaintiff had *moderate* deficiencies in concentration, persistence, or pace, and it is not clear that the limitation to "simple, routine, repetitive" work fully incorporates this finding. While quantifying "moderate" deficiencies in concentration to 50% may be high, even if a moderate deficiency means drifting off task 20% -30% of the time that would have a significant vocational impact unless quotas are eliminated from the hypothetical question. It is hard to reasonably accept "moderate" meaning anything less that 20-30% of the time at work.

There seem to be two components to having moderate problems in concentration. One deals

---

[5] A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning. *Id*.

with the frequency of how often one cannot concentrate. The other deals with the level of sophistication or intensity of the work that can be done with the concentration limitation. The hypothetical question asked by ALJ Sasena encompasses the later effects of concentration problems by limiting Plaintiff to only simple repetitive tasks, but does not seem to specifically address the frequency of how often that worker would be unable to concentrate. While eliminating the stress of more complex jobs which the *Smith* court found relevant to accommodating a worker with concentration problems, ALJ Sasena here does not eliminate the stress of production quotas – as did the ALJ in *Smith* – which likely accompany the bench assembler, surveillance system monitor and cashier positions VE Minkus identified.

VE Minkus identified both light and sedentary jobs at the hearing, yet, given VE Sasena's finding that Plaintiff was limited to "a restricted range of sedentary work", this analysis need only review the VE testimony concerning sedentary jobs. VE Minkus identified unskilled, sedentary bench assembler jobs as being 1,000 regionally, 38,000 nationally; parking lot attendant 1,000 regionally, 45,000 nationally; surveillance monitor 1,500 regionally, 45,000 nationally; and cashier II jobs as 1,500 regionally, 70,000 nationally (R. 237). Yet, when asked on cross examination what the effects of a reduced concentration was, VE Minkus noted that no more than a 10% reduction to 90% attentiveness was required for many of the jobs.

Because this Court need spend little time determining that a moderate limitation of concentration would be at least 10%, VE Minkus' testimony would eliminate all assembly and surveillance jobs, and likely the cashier jobs as well (R. 240-41). That leaves only the 1,000 parking

8

lot attendant jobs regionally (45,000 nationally).[6] Given the fact that parking lot attendant jobs require cashiering type work, albeit far less frequently, it is unclear if any of these jobs also would be eliminated if the ALJ meant that moderate limitations of concentration, persistence or pace meant a reduction of 20-30% of the time. VE Minkus could not give any opinion on how many jobs would be eliminated with a 25% concentration limitation (R. 241).

Although the Plaintiff's attorney on cross examination did much to remedy the problems of dealing more thoroughly with Plaintiff's moderate limitations of concentration, persistence or pace, it was not sufficient to resolve all matters. Nor did the ALJ avail himself of the opportunity for redirect examination to rehabilitate VE Minkus's testimony that excluded most jobs if the hypothetical worker had only a 10% reduction in concentration. Further, because it is believed that *Bankston's* 50% figure for defining "often" is no longer binding precedent on the meaning of a term no longer used, and because the meaning of "often" and now "moderate" are terms appropriately determined by the Commissioner, to whom Congress has delegated the authority to draft regulations and define the meaning of terms if reasonable, the extent of Plaintiff's limitations on concentration, persistence or pace, whether caused by her medication or her depression, is not one for this Court to define.

---

[6] The Sixth Circuit held that 1,350 to 1,800 jobs in a nine-county area satisfied the requirement of "work which exists in significant numbers either in the region where such individual lives or in several regions." *Hall v. Bowen*, 837 F.2d 272 (6th Cir. Jan. 20, 1988); *see also Lee v. Sullivan*, 988 F.2d 789, 794 (7th Cir. 1993) (citing various other circuit cases finding 500-1200 "significant."), *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004); *Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir.1992) (found an occupation base reflecting 650-900 statewide jobs was small enough to put the issue in a gray area requiring a remand in order for the ALJ to address the question a "significant" number of jobs under 42 U.S.C. § 423(d)(2)(A) which the federal courts could then review.).

Yet, here we don't know what additional limitations over 10% Plaintiff has and its impact on her occupational base already reduced to 1,200 jobs.

In sum, unlike the *Smith* case, ALJ Sasena's hypothetical question did not adequately accommodate Plaintiff's having moderate deficiencies in concentration by other "more concrete" limitations placed into the hypothetical. If the hypothetical question is flawed, VE Munkis' response to it cannot be substantial evidence under 42 U.S.C. § 405(g) to support the ALJ's Step 5 determination that Plaintiff was not disabled. Thus, in the present case reversal of the Commissioner's determination is required.

### B. Treating Source Opinion

Plaintiff argues that ALJ Sasena's decision "fails to analyze the opinion by [Ms. Kalisz] under the treating source rule" (Dkt. #8, p 10).[7] Ms. Kalisz, a nurse practitioner, is Plaintiff's main treating source. Ms. Kalisz diagnosed congestive heart failure, hypertension, degenerative joint disease of the knees, obesity and depression (R. 191). In ALJ Sasena's decision he references the fact that Ms. Kalisz had been treating Plaintiff since July 2005 and fully reiterates Ms. Kalisz's diagnosis before going to find that Plaintiff had the following severe impairments: arthritis of both knees and thoracic spine, major depressive disorder, generalized anxiety disorder, history of poly substance abuse and obesity (R. 17, 18).

The only sources who can provide evidence to establish an impairment are licensed

---

[7] The treating source rule directs the ALJs to review the following factors when determining what weight to give an acceptable medical source:
• How long the source has known and how frequently the source has seen the individual;
• How consistent the opinion is with other evidence;
• The degree to which the source presents relevant evidence to support an opinion;
• How well the source explains the opinion;
• Whether the source has a specialty or area of expertise related to the individual's impairment(s); and
 • Any other factors that tend to support or refute the opinion.
20 C.F.R. §404.1527(d).

physicians (medical or osteopathic doctors); licensed or certified psychologists; licensed optometrists; licensed podiatrists; and qualified speech-language pathologists. 20 C.F.R. § 404.1513. Evidence from one of these "acceptable medical sources" is *required* to establish whether a claimant has a medically determinable impairment(s). *Id.* Plaintiff argues that Social Security Regulation 06-03p, released after the ALJ's decision, requires that Ms. Kalisz's opinion be given greater weight than ALJ Sasena provided.[8] Specifically, Plaintiff argues that Ms. Kalisz's opinion that Plaintiff suffered from congestive heart failure, that her hypertension was not controlled and that she lacked the ability to work was improperly ignored by ALJ Sasena.

First, it is well-known that the ALJ does not have to adopt the opinion of any source, be it "acceptable" or "other", on the issue of whether or not a claimant is disabled, as this is a determination which is left to the Commissioner. 20 C.F.R. §§ 404.1527(a), (b), and (e)) (differentiating between physician opinions concerning what a claimant can still do and the claimant's physical and mental restrictions, which the Commissioner will consider, and a physician's statements such as "a claimant is disabled" or "unable to work," which are not medical opinions, but opinions on issues reserved to the Commissioner).

Further, S.S.R. 06-03p states that while "we may use evidence from 'other sources,' " such as a nurse practitioner, "to show the severity of the individual's impairment(s) and how it affects the individual's ability to function", "[i]nformation from these 'other sources' cannot establish the existence of a medically determinable impairment. Instead, there must be evidence from an 'acceptable medical source' for this purpose." S.S.R. 06-03p. "The evaluation of an opinion from

---

[8] The parties did not raise the issue of whether this SSR has retroactive effect, so it is not addressed in this Report.

11

a "non-medical source" who has seen the individual in his or her professional capacity depends on the particular facts in each case. Each case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case." *Id.*

As ALJ Sasena noted, there is no definitive diagnosis nor objective medical evidence of CHF from an acceptable medical source in the record. Plaintiff's September 1, 2005, ECG showed some abnormal T-waves, but the ECG record also indicates a normal sinus rhythm and provides an "unconfirmed diagnosis" (R. 177). Following this ECG, the Cardiology Institute of Michigan suggested more tests and gave a diagnosis of hypertension controlled (R. 176-78). At the hearing in this matter Plaintiff's attorney indicated Plaintiff had been referred to a cardiologist and that they expected to submit test results from a two-step stress test that was take place in late September or October, but there is no evidence in the record regarding the results of these tests.

ALJ Sasena discounted Ms. Kalisz's opinion regarding Plaintiff's CHF due to the fact that there was no objective medical evidence nor a definitive diagnosis of such (R. 18). ALJ Sasena also indicated that the record evidence contained information indicating that Plaintiff's hypertension was controlled. Even an acceptable medical source whose diagnosis is unsupported by objective medical evidence is subject to having their opinion discounted pursuant to the regulations. 20 CFR §404.1527(d)(2). Therefore, because ALJ Sasena discussed Ms. Kalisz's diagnosis, the length of treatment of her treating relationship with Plaintiff and the reasons he did not adopt her opinion on the issue of CHF and hypertension, it appears that he did follow the treating source rule with respect to Ms. Kalisz and, further, there was sufficient evidence in the record with which to discount her opinion on these issues.

In sum, though Plaintiff correctly points out that SSR 06-03p provides new guidance for considering opinions from "other sources", this Regulation does not change the requirement that any source's opinion be "consistent. . . with other evidence" and supported by objective medical evidence. Therefore, ALJ Sasena did not commit error in his treatment of Ms. Kalisz's opinion.

C. **Obesity's Effect on Function**

Plaintiff argues that ALJ Sasena failed to adequately consider what effect obesity has on her ability to perform basic work activities (Dkt. #8, p. 14). It is undisputed that ALJ Sasena considered Plaintiff's obesity, and in fact found that obesity contributed to the physical impairments that significantly limited her ability to work (R. 18). Further, Plaintiff has not pointed to any evidence or testimony in the record which indicates how her obesity limits her ability to work in greater or different ways than compensated for in the RFC assigned by ALJ Sasena.[9] Therefore, Plaintiff's argument on this issue seems to stem from the notion that SSR 02-01p requires a greater or more specific articulation of the "nexus" between a claimant's obesity and her other impairments and that failure to include such an articulation in the decision is sufficient grounds for remand.

SSR 02-01p indicates that the Commissioner will consider the effect of a claimant's obesity on social functioning; the individual's ability to perform routine movement, necessary physical activity within the work environment and sustained work activities in an ordinary work setting on

---

[9] Plaintiff does explain that her CHF, hypertension and degenerative joint disease are related to obesity, but this fact does not provide guidance as to why she believes she is more limited than ALJ Sasena found in her RFC. The simple fact that these impairments are all related, or even that treatment for her other impairments is made more difficult because of obesity, does not provide information that is useful in determining the extent of her limitations. In fact, Plaintiff testified that she did not think obesity exacerbated her lower extremity impairments or her ability to function, other than *perhaps* her ability to walk long distances (R. 226-27).

a regular and continuing basis; and the combined effects of obesity with other impairments. SSR 02-01p. It does not set forth any particular manner in which this is to be articulated in the decision or specify any specific mode of analysis for obese disability claimants. *Bledsoe v. Barnhart*, 165 Fed. Appx. 408, 411-412, 2006 WL 229795,*3 (6th Cir. 2006).

Therefore, because ALJ Sasena's decision contains evidence that he considered obesity in determining Plaintiff's RFC and Plaintiff has not provided any evidence to support an argument for a more limited RFC based on obesity, ALJ Sasena's decision on this issue should not be overturned.[10]

## III. RECOMMENDATION

For the reasons stated above, IT IS RECOMMENDED that Defendant's Motion for Summary Judgment be DENIED and Plaintiff's Motion for Summary Judgment GRANTED and the case remanded for further administrative proceedings to determine whether, when Plaintiff's moderate limitations "concentration, persistence or pace" are properly considered by the vocational expert, there remains a significant number of jobs that Plaintiff can perform " either in the region where such individual lives or in several regions."

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten days of service of a copy hereof as provided for in 28 U.S.C. section 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *United States v. Walters,* 638 F.2d 947 (6th Cir.

---

[10] Plaintiff also argues that ALJ Sasena failed to properly evaluate the effect of her hypertension. As explained in the Treating Source section above, ALJ Sasena had sufficient evidence in the record with which to determine that Plaintiff's hypertension was controlled and therefore not severe impairment.

14

1981), *Thomas v. Arn*, 474 U.S. 140 (1985), *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987), *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objection must be served upon this Magistrate Judge.


Dated: June 12, 2007                                                    s/Steven D. Pepe
Ann Arbor, Michigan                                       United States Magistrate Judge


**CERTIFICATE OF SERVICE**

I hereby certify that on June 12, 2007, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:Janet L. Parker, Lewis M. Seward, and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants: Social Security Administration, Office of the Regional Counsel, 200 W. Adams, 30th. Floor, Chicago, IL 60606

                                                           s/James P. Peltier
                                                           Courtroom Deputy Clerk
                                                           U.S. District Court
                                                           600 Church St.
                                                           Flint, MI 48502
                                                           810-341-7850
                                                           pete_peltier@mied.uscourts.gov